Filed 4/18/23  Sanchez v. CoreCivic of Tennessee CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| MONICA NICOLE WILLIAMS SANCHEZ, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CORECIVIC OF TENNESSEE, LLC et al., <br><br> Defendants and Appellants. | D080285 <br><br><br> (Super. Ct. No. 37-2021-00046382-CU-WT-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed and remanded.

Gleason and Favarote, Paul M. Gleason and Jing Tong, for Defendants and Appellants.

Bodell Law Group, Daniel D. Bodell; Williams Iagmin and Jon R. Williams, for Plaintiff and Respondent.

This appeal revolves around a single paragraph in a complaint that contains 127 paragraphs and asserts ten causes of action.  Defendants CoreCivic of Tennessee and Bessy Glaske appeal from the trial court's order denying their special motion to strike as a strategic lawsuit against public

participation (SLAPP) eight of the ten causes of action asserted by plaintiff Monica Nicole Williams Sanchez.  In the underlying retaliation and discrimination action, Sanchez alleges that defendants harassed, retaliated against, and wrongfully terminated her for reporting the company's unlawful and unethical conduct and for seeking medical leave to which she was legally entitled.  Defendants argue in their anti-SLAPP motion that eight of Sanchez's claims are based on an alleged conversation between Glaske and a governmental agency, which Sanchez references in one paragraph in her general allegations, and her claims thus arise from protected speech and activity.

On de novo review, we conclude that defendants' alleged liability is not predicated on any protected activity, and the trial court thus properly denied their anti-SLAPP motion.  Accordingly, we affirm the trial court's order.  We also find that defendants' anti-SLAPP motion, and their appeal of the denial of that motion, are devoid of merit, and on that basis grant Sanchez's request for an award of fees and costs on appeal.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Parties*

CoreCivic of Tennessee, LLC (CoreCivic) is a for-profit, publicly traded company headquartered in Tennessee that owns and manages private prisons and detention centers on contract with federal, state, and local governments.  Specifically, CoreCivic designs, builds, manages, and operates correctional facilities and detention centers for the Federal Bureau of Prisons, Immigration and Customs Enforcement, the United States Marshals Service, as well as state and county facilities across the United States.  CoreCivic operates one such correctional facility, located on Boston Avenue in

2

San Diego, under contract with the California Department of Corrections and Rehabilitation (CDCR).

Sanchez is a San Diego resident who was employed by CoreCivic and its predecessors from 1994 until her termination in 2021. She has held a variety of roles at CoreCivic, including program manager, senior case manager, case manager, job developer, disciplinary hearing officer and clerk. She was named facility director at the Boston Avenue facility (the facility) in 2013.

Defendant Bessy Glaske is a managing director for CoreCivic and one of Sanchez's direct supervisors during her employment with CoreCivic. Glaske controlled all aspects of Sanchez's employment, including her hiring and termination, setting her compensation terms, and setting the terms of the employment agreements.

B. *Factual Background as Alleged in Complaint*

In May 2021, the CDCR made an unannounced visit to the facility and expressed concerns to Sanchez about CoreCivic. The CDCR complained about CoreCivic's failure to maintain staffing levels, its lack of programming, the amount and quality of food served to inmates, and its failure to test for fentanyl. Sanchez had previously made identical complaints to CoreCivic and her supervisor Glaske, which she reminded Glaske of on the day of the CDCR visit.

In August 2021, Sanchez had a meeting with Glaske and a senior director at CoreCivic to discuss Sanchez's leadership potential and future goals with the company. Glaske told Sanchez she was considered a high performer and was slated toward accelerated development, and she scheduled a meeting with Sanchez for the following month to discuss future promotions.

Later that month, Sanchez advised Glaske that she intended to take leave pursuant to the Family Medical Leave Act (FMLA) and California Family Rights Act (CFRA) due to grief-related health issues after her mother had passed away. She told Gaske that she had been experiencing an extremely hard time dealing with her mother's recent death but had been forced to miss numerous grief counseling sessions and parent loss grief groups because of work demands. Sanchez also told Glaske that she had gotten a dog from the humane society that was intended for emotional support, but the dog had not alleviated her grief. Sanchez further informed Glaske that she was under the care of a psychiatrist but was unable to take her prescribed medication because it made her drowsy and she was on call for work every hour of every day.

In September 2021, Sanchez learned about an incident relating to a monthly CoreCivic bill that had been presented to a CDCR employee for approval. The CDCR employee signed it but also wrote a note on the bill stating something to the effect of "waste of money, fraud, lack of programming, only three counselors." After a CoreCivic accountant received the bill and note, she showed it to Sanchez, who expressed concern and stated that the note must be reported to CoreCivic and Glaske. Instead, the accountant ripped up the note. Sanchez was alarmed and reported the incident to Glaske via email and phone. Sanchez was eventually able to locate the ripped-up note from the accountant's trash bin after the accountant had originally claimed she had placed it in the shredding bin. Sanchez taped the note back together and emailed the recovered note to Glaske.

Later that day, Sanchez again spoke with Glaske to confirm she would be taking FMLA/CRFA leave. Glaske was not receptive to this news and insisted Sanchez was not eligible to take leave. Sanchez informed Glaske

4

that she had already confirmed with CoreCivic's human resources manager that she was eligible, but Glaske instructed Sanchez to confirm her eligibility with CoreCivic's human resources generalist.

Sanchez was unable to reach the human resources generalist but confirmed again with the human resources manager that she was eligible for FMLA/CRFA leave. Sanchez then emailed excerpts of CoreCivic's FMLA/CRFA policy to Glaske to demonstrate her eligibility and informed Glaske that she would be starting her leave on September 20, 2021. That evening, Sanchez called Glaske and complained that Glaske's efforts to discourage her from taking leave were upsetting. Shortly after that conversation, Glaske responded to Sanchez's email from earlier in the day regarding her leave eligibility and indicated she was happy that Sanchez got the information that she needed. According to Sanchez, this was an attempt to deflect Sanchez's criticism of Glaske during their phone call.

The next day, Sanchez met with her psychiatrist to discuss her leave, and they determined that Sanchez would take FMLA/CFRA for eight weeks, with Sanchez's last workday on September 17, 2021. Following this meeting, Sanchez spoke with Glaske to confirm again that Sanchez's last day of work prior to her leave would be that upcoming Friday and to inquire about Glaske's meeting with the CDCR. Glaske told Sanchez that the meeting with the CDCR went well for the most part, but the CDCR representatives complained about the lack of programming and counselors. At no time did Glaske indicate that the CDCR had concerns with Sanchez's performance as facility director.

On September 16, 2021, the day before Sanchez's last day of work before her FMLA/CFRA leave began, Glaske and CoreCivic advised her that although they were happy with her performance, the CDCR wanted a change

5

of leadership at the facility, and CoreCivic was therefore terminating her immediately. Glaske and CoreCivic then presented Sanchez with a severance agreement providing that in exchange for approximately $50,000 (six months of salary) minus withholdings, Sanchez would give up all of her rights to sue CoreCivic and its employees, keep the settlement confidential, and agree that CoreCivic was not admitting to any fault whatsoever. The severance agreement further stated: "Employee also acknowledges that Employee has been properly provided any leave of absence that Employee may be or may have been entitled to under the Family and Medical Leave Act and has not been subjected to any improper treatment, conduct, or actions due to a request for or taking such leave. Employee acknowledges that Employee has had the opportunity to provide the Company with notice of any and all concerns regarding suspected ethical and compliance issues or violations on the part of the Company or the Released Parties."

C. *Complaint*

Sanchez timely filed charges of discrimination with the Department of Fair Employment and Housing (DFEH) against defendants and received right to sue letters. She then filed suit against defendants, asserting ten causes of action: (1) retaliation in violation of Labor Code section 1102.5; (2) wrongful termination and retaliation in violation of public policy; (3) unfair business practices in violation of Business and Professions Code section 17200 et seq.; (4) intentional infliction of emotional distress; (5) employment discrimination in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940 et seq.); (6) failure to accommodate in violation of FEHA (Gov. Code, § 12940 et seq.); (7) retaliation in violation of FEHA (Gov. Code, § 12940 et seq.); (8) harassment based on medical condition and election to take medical leave in violation of FEHA (Gov. Code,

6

§ 12940 et seq.) (9) violation of Civil Code section 3344; and (10) failure to provide personnel records in violation of Labor Code section 1198.5. She asserted the fourth claim against Glaske, the eighth claim against both Glaske and CoreCivic, and the remaining claims against only CoreCivic.

Sanchez alleged that defendants harassed, discriminated against, and retaliated against her in response to her medical condition and decision to take medical leave, as well as her discovery of and complaints about illegal, unethical, and unsafe practices of defendants and others at the facility relating to facility staffing and operations. Sanchez also alleged that, despite stating they were pleased with her performance, defendants did not offer to transfer her to another facility or put her on a performance improvement plan. According to Sanchez, this is because defendants wrongfully terminated her employment in response to her complaints about defendants' illegal, unethical, and unsafe practices and her impending medical leave.

The complaint alleged that Glaske was intimately aware of Sanchez's urgent need to take FMLA/CFRA leave but terminated her anyway. Sanchez alleged that, during Glaske's meeting with the CDCR, she disparaged Sanchez's performance to deflect the CDCR's criticism from her own performance and save her own job. According to Sanchez, Glaske's statements denigrating her performance were demonstrably false, and Glaske knew her comments would ruin Sanchez's career. She further alleged that her termination and Glaske's statements to the CDCR were motivated by Glaske's personal animus toward Sanchez and were an attempt to silence her whistleblowing.

Sanchez claimed that defendants' illegal conduct resulted in her financial and emotional harm. She sought damages, interest on the losses

incurred in earnings and other employee benefits, punitive damages, civil and statutory penalties, and injunctive relief.

D. *Defendants' Special Motion to Strike*

Defendants filed a special motion to strike pursuant to Code of Civil Procedure section 425.16,[1] known as an anti-SLAPP motion, against the complaint's first eight causes of action. Defendants claimed that these causes of action arise from protected activity under section 425.16, subdivisions (e)(l), (e)(2) and (e)(4), because they seek damages and other relief based on communications between defendants and the CDCR that were made in connection with an issue under review by the CDCR and in connection with a public issue and/or an issue of public interest. They argued that causes of action one through eight in Sanchez's complaint must be dismissed because (1) the conduct giving rise to the claims was defendants' unfavorable report of Sanchez's job performance to the CDCR as part of the CDCR's review of the facility, the CDCR's subsequent request that Sanchez be replaced, and CoreCivic's termination of Sanchez's employment in furtherance of that request, all of which constituted protected speech and/or actions in furtherance of that speech under the anti-SLAPP statute; and (2) Sanchez cannot establish a probability of prevailing on the merits of her claims.

Defendants argued that all statements made to and from a governmental agency such as the CDCR in connection with an official review are protected by the anti-SLAPP statute. They also argued that Sanchez's first eight claims were all based on her allegation that Glaske disparaged her job performance in statements made to the CDCR as part of their official review of the facility. According to defendants, Sanchez's claims were thus necessarily based on protected speech.

---

[1]    All further statutory references are to the Code of Civil Procedure.

In support of their motion, defendants submitted a short declaration from Glaske explaining that CoreCivic operates the facility under a contract with the CDCR, stating that the CDCR and CoreCivic's other governmental partners operate in areas of public interest, and setting forth (and attaching as an exhibit) CoreCivic's mission statement. Glaske's declaration did not contain any information about Sanchez, her employment, or her allegations against defendants. Specifically, Glaske's declaration did not include any facts addressing the merits of Sanchez's claims of harassment, discrimination, retaliation, or failure to accommodate.

E. *Sanchez's Opposition*

Sanchez argued in opposition that defendants' motion was frivolous, as her claims were clearly not based on statements to or from the CDCR. She contended that defendants were attempting to hide their misconduct behind a single meeting between Glaske and the CDCR that was briefly referenced in the complaint. Defendants' wrongful actions toward Sanchez, she argued, were not "inextricably connected" to any protected speech by defendants and/or the CDCR and in fact were wholly unrelated to the CDCR.

Instead, Sanchez argued, the basis of her complaint is that defendants terminated her due to her complaints about defendants' illegal, unethical, and unsafe practices (including her complaints that CoreCivic deliberately did not hire additional counselors to maximize its profits, in violation of its contract with the CDCR), her impending medical leave, her ongoing medical condition, her refusal to ignore another employee's violation of CoreCivic's Code of Ethics and document retention policy by destroying evidence. Sanchez argued that none of those allegations constituted protected speech or petitioning activity under the anti-SLAPP statute and the trial court should therefore deny defendants' motion. Even if her claims were based on

9

protected activity, she argued, the lengthy declaration she submitted in support of her opposition to the anti-SLAPP motion constituted sufficient evidence to demonstrate minimal merit on each of the challenged claims.

Sanchez's declaration contained many of the facts outlined in her complaint but also provided additional details supporting her claims, as set forth below.

1. *Sanchez's Duties and Performance History*

Sanchez explained that as facility director, her duties were wide-ranging. Per CoreCivic policy, though, many decisions and policies regarding the facility were made by Glaske and other senior management personnel. Throughout her career at CoreCivic, Sanchez received outstanding evaluations and was repeatedly promoted. She was often praised by CoreCivic and Glaske and received regular raises, bonuses, and stock options. Her last review prior to her September 2021 termination was in February 2021. The review was conducted by Glaske, who gave Sanchez the highest possible overall competency rating of "exceeds expectations."

2. *The CDCR's Visit to the Facility*

Sanchez also detailed in her declaration how, during the CDCR's May 2021 visit to the facility, CDCR personnel complained about CoreCivic's failure to maintain staffing levels and lack of programming. At the time, the facility only had two counselors but a population of over sixty participants. Per CoreCivic's contract with the CDCR, the counselor ratio should have been 1 to 18, but the facility had been significantly short staffed since the beginning of the year. According to Sanchez, CoreCivic deliberately did not hire additional counselors so it could maximize its profits, in violation of its contract with the CDCR. The CDCR also complained about the amount and quality of food served to inmates and CoreCivic's failure to test for fentanyl.

10

These complaints were identical to complaints Sanchez had repeatedly lodged with defendants.

That same day, Sanchez discussed the CDCR's complaints with Glaske, reminding her that she had previously complained of these issues, and again inquired why CoreCivic continued to accept inmates despite inadequate staffing. In response, Glaske repeated her prior response that Sanchez should not worry about it. As was the case when Sanchez had previously complained to Glaske, Glaske appeared annoyed with Sanchez's continued persistence in complaining about these issues.

CDCR employee Jessica F. repeatedly assured Sanchez that their criticisms were not directed toward her, but rather toward CoreCivic. Jessica stated that the CDCR was unhappy with CoreCivic but happy with Sanchez's performance.

3. *Note Incident*

Sanchez's declaration also provided further details about the incident with one of CoreCivic's accountants, Roberta M., that took place a couple of weeks before Sanchez's termination. After Roberta ripped up the handwritten note containing comments from a CDCR employee complaining about CoreCivic's waste of money, fraud, and lack of programming and counselors, Sanchez was alarmed and reported the incident to Glaske. Sanchez was required to do so pursuant to CoreCivic's Code of Ethics (Code), which states that employees must report possible violations of the Code and prohibits retaliation as a result of making a report. Roberta's destruction of the note was a clear violation of CoreCivic's document retention policy outlined in the Code, which Sanchez declared reads as follows: "No CoreCivic employee is ever authorized to destroy or alter any company record based on a concern that the record could be harmful to CoreCivic in a potential

11

investigation, audit or litigation. Employees must comply with CoreCivic's records retention policy and procedures, as well as any 'hold' notices issued under the policy." The Code states that employees may be terminated for violating the Code.

When Sanchez reported the note and its destruction to Glaske, Glaske resisted Sanchez's requests that the note and Roberta's destruction of it be reported to upper management at CoreCivic. Glaske informed Sanchez that, even though it appeared that CoreCivic was being accused of fraud, and that a CoreCivic employee had destroyed evidence relative to that accusation, she had no intention of reporting the incident to upper management. Sanchez told Glaske that her approach was inappropriate and violated CoreCivic policy. She further advised Glaske that she intended to retrieve the shredded note and insisted that Glaske share it with her direct supervisor. After Sanchez eventually found the note in Roberta's trash and the note was taped back together, she immediately emailed the recovered note to Glaske.

4. *Sanchez's Final Meetings with Glaske and Termination*

During Sanchez's meeting with Glaske two days prior to Sanchez's termination, Glaske stated that the meeting with CDCR personnel went well for the most part, but they spoke about the need to increase programming and the lack of counselors. At no time did Glaske indicate that the CDCR had concerns with Sanchez's performance.

As Sanchez explained in her complaint, CoreCivic terminated her two business days before her FMLA/CFRA leave was to begin. In her declaration, Sanchez added that, during that meeting with Glaske and Human Resources Director Steve S., Sanchez specifically requested that she be allowed to file a grievance regarding her termination pursuant to CoreCivic policy. That policy, outlined in the Code, allows employees who believe they have been

12

unfairly disciplined to file an employee grievance with CoreCivic. Sanchez also requested that she be considered for a transfer to one of the numerous other CoreCivic facilities given that she was eligible for a transfer pursuant to CoreCivic policy. Glaske and Steve rejected both requests.

Sanchez stated in her declaration that, as a result of defendants' actions, she has suffered and continues to suffer substantial losses in earnings, bonuses, and other employment benefits, as well as anxiety, humiliation, mental anguish, embarrassment, worry, sleeplessness, and mental and emotional distress. She also attached copies of CoreCivic's Code of Ethics and proposed severance agreement to her declaration.

F. *Defendants' Reply*

Defendants' reply in support of their anti-SLAPP motion argued that Sanchez sought to ignore her claims as pleaded and instead impermissibly recast "the heart of her complaint" as a single meeting between Glaske and the CDCR. Defendants argued that Sanchez admitted in her complaint that each of her first eight causes of action were based at least in part on Glaske's statements to the CDCR as part of its official review of the facility, and the CDCR's statements that they had lost faith in Sanchez's ability to competently perform her job. They further argued that Sanchez's allegation regarding Glaske's statements to the CDCR supplied an element of each of Sanchez's claims. Finally, they claimed that Sanchez failed to show minimal merit and her first eight claims must therefore be stricken.

G. *Trial Court Ruling*

The trial court held a hearing on defendants' anti-SLAPP motion and, shortly after, adopted its tentative ruling denying the motion. The court stated that it did "not find that the gravamen of plaintiff's action is within

13

the purview of CCP 425.16" and that plaintiff's request for attorneys' fees pursuant to the statute could be decided by a separately noticed motion.

Defendants timely appealed the order.

DISCUSSION

I

A. *Governing Law and Standard of Review*

California's anti-SLAPP statute authorizes a special motion to strike any claim "against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Subdivision (e) of section 425.16 sets forth four categories of protected activity: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(1)–(4).)

Our review of an order granting or denying an anti-SLAPP motion is de novo. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).) We first determine whether the defendant has established that the challenged claim arises from activity protected under

14

section 425.16, meaning that the activity itself forms the basis of the claim. (*Ibid.*; *id.* at p. 1062; *Balla v. Hall* (2021) 59 Cal.App.5th 652, 671 (*Balla*).) At this first step, courts analyze "each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected[.]" (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1010 (*Bonni*).)

" 'If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success.' " (*Balla, supra,* 59 Cal.App. 5th at p. 671, citing *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) Our review at this second step is similar to our review of a ruling on a summary judgment motion. (*Baral*, at p. 384.) We accept the plaintiff's evidence as true and consider the defendant's evidence only to determine whether it defeats the challenged claim as a matter of law. (*Id.* at p. 385.) Claims with at least minimal merit may proceed. (*Bonni, supra,* 11 Cal.5th at p. 1009.)

B. *Analysis*

We address as an initial matter defendants' argument that the trial court incorrectly applied a gravamen test to Sanchez's complaint as a whole rather than analyzing each claim for relief to determine whether the activity was protected, in contradiction of the Supreme Court's instruction in *Bonni* and *Baral*. As the Supreme Court explained in *Bonni*, however, not every court that labels its approach as a "gravamen" test has erred; some courts have properly invoked the term "to determine whether particular acts alleged within the cause of action supply the elements of a claim . . . or instead are incidental background." (*Bonni, supra,* 11 Cal.5th at p. 1012.) The trial court did not specify in its order in which way it invoked the term "gravamen," but we must presume the trial court knew and properly applied

15

the law.  (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)  Thus, defendants have failed to demonstrate that the trial court used the term "gravamen" in a legally impermissible way.  And even if the court did not properly invoke the term in reaching its decision, if the decision is correct on any theory, we must affirm it regardless of the court's reasoning. (See *ibid*.)

Turning to step one of the anti-SLAPP analysis, defendants contend that each of Sanchez's first eight causes of action are based on protected activity because (a) they rely on the allegation that Glaske made disparaging statements about Sanchez in a meeting with the CDCR, and (b) all statements made in connection with official governmental reviews are entitled to anti-SLAPP protection.  Specifically, defendants point to paragraph 61 of the complaint, which alleges:  "Further, during her meeting with CDCR, Glaske disparaged Plaintiff's performance in an attempt to deflect CDCR's criticism from her own shoddy performance and save her own job.  Glaske's statements denigrating Plaintiff's performance were obviously and demonstrably false.  When Glaske made these charges against Plaintiff, she knew they were false and would torpedo Plaintiff's career.  Glaske's false charges were motivated by Glaske's personal animus toward Plaintiff and were designed to silence her whistleblowing."

Sanchez responds that defendants are attempting to use a single paragraph of her complaint to recast all of her claims as arising from protected speech or petitioning activities while ignoring the rest of her allegations that are wholly unrelated to communications to or from the CDCR.  She argues that the allegations in paragraph 61 merely provide context and supply evidence of Glaske's retaliatory animus rather than an essential element or basis for liability.

16

Sanchez has the better argument. A claim challenged in an anti-SLAPP motion "may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted"—an important distinction. (*Park*, *supra*, 2 Cal.5th at pp. 1060, 1064.) The question is whether the protected activity supplies an element of the claim at issue. (*Id.* at p. 1063.) In reviewing the defendants' anti-SLAPP motion, therefore, we must consider the elements of each challenged claim, the actions alleged to supply those elements (and thus form the basis for liability), and whether those actions are protected. (*Ibid.*; *Bonni*, *supra*, 11 Cal.5th at p. 1015.) "Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral*, *supra*, 1 Cal.5th at p. 394; see also *Oakland Bulk and Oversized Terminal, LLC v. City of Oakland* (2020) 54 Cal.App.5th 738, 759 [directing trial court to deny anti-SLAPP motion on the merits where the incorporated allegations of protected activity merely provided context and were not the basis for plaintiffs' claims for recovery].)

Properly construed in light of the facts Sanchez has alleged in her complaint and declaration, we conclude that each of her claims is based on unprotected activity. Any allegations of protected activity in paragraph 61 of her complaint merely provide context and therefore cannot be stricken.

1. *Sanchez's Discrimination and Retaliation Claims*

Defendants argue that Sanchez's first, second, fifth, sixth, and seventh causes of action are based on protected speech because each requires proof of an adverse employment action as one of its elements. According to defendants, the complaint alleges that Glaske's statements to the CDCR evaluating Sanchez's job performance constituted an adverse employment

17

action taken to retaliate against Sanchez, thus supplying an essential element of her first, fifth, and seventh causes of action for retaliation in violation of Labor Code section 1102.5, employment discrimination in violation of FEHA, and retaliation in violation of FEHA, respectively. They further argue that Glaske's speech to the CDCR and CoreCivic's act in terminating Sanchez at the CDCR's direction was an action in furtherance of protected speech that supplied the adverse employment action that is an essential element of Sanchez's second cause of action (wrongful termination and retaliation in violation of public policy) and sixth cause of action (failure to accommodate in violation of FEHA) as well.

We are not persuaded. The Supreme Court recently addressed the application of section 425.16 to employment discrimination and retaliation claims and provided useful guidance applicable here: "The anti-SLAPP statute does not apply simply because an employer protests that its personnel decisions followed, or were communicated through, speech or petitioning activity. . . . [T]o carry its burden at the first step, the defendant in a discrimination suit must show that the complained-of adverse action, in and of itself, is an act in furtherance of its speech or petitioning rights. Cases that fit that description are the exception, not the rule." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 890.) This case is not an exception, and the fact that CoreCivic's decision to terminate Sanchez may have followed or been communicated through speech or petitioning activity does not compel the conclusion that the termination itself is a protected act.

It is also plain from Sanchez's complaint and declaration that her claims do not arise from Glaske's speech. Sanchez's first, second, fifth, sixth, and seventh causes of action are based on specific allegations that CoreCivic wrongfully terminated her and retaliated against her in response to her

18

reports of illegal, unethical, and unsafe conduct, and discriminated against her, failed to accommodate her, and retaliated against her in response to her request for medical leave. None of the specific allegations under these causes of action refer to or rely on any statements Glaske may or may not have made to the CDCR.

None of Sanchez's general allegations reference Glaske's statements about Sanchez to the CDCR, either, with the exception of paragraph 61. Defendants' assertion that Sanchez pleads in paragraph 61 that she was terminated at the direction of the CDCR, and therefore in furtherance of the CDCR's speech, is factually wrong. Nowhere in her complaint does Sanchez allege that the CDCR directed defendants to fire her in response to Glaske's statements. Instead, she alleges that defendants wrongfully terminated her in response to her complaints about defendants' unethical practices and her request for medical leave, arguing that defendants' claim that they were terminating her because the CDCR desired a change of leadership at the facility was pretext.

Specifically, she details in her general allegations that (1) Sanchez reported to Glaske critical staff shortages and lack of programming at the facility, which CoreCivic failed to remedy, (2) the CDCR's complaints about the facility mirrored Sanchez's prior complaints, (3) Sanchez reported conduct by another CoreCivic employee who attempted to destroy a business record containing allegations of fraud asserted by a CDCR employee, (4) Glaske attempted to thwart Sanchez from taking medical leave, and (5) defendants terminated Sanchez just before her medical leave was to begin, after 27 years of service to CoreCivic, and refused her grievance and transfer requests despite claiming they were pleased with Sanchez's performance.

19

Nor does Sanchez reference any of Glaske's statements about her from that meeting in the declaration she submitted in support of her opposition to defendants' anti-SLAPP motion. Instead, she provides additional evidence supporting her claim that defendants terminated Sanchez because of her whistleblowing and request for medical leave and *not* because they were directed to do so by the CDCR. For example, Sanchez states that CDCR employee Jessica F. repeatedly assured her that the CDCR's criticisms were not directed toward her, but rather toward CoreCivic, and the CDCR was happy with Sanchez's performance. She also describes how Glaske became annoyed with Sanchez when she persisted in complaining about issues at the facility and how defendants rejected Sanchez's request that she be considered for a transfer to one of the numerous other CoreCivic facilities even though she was eligible and defendants told her they were pleased with her performance.[2]

Rather than supplying an essential element of Sanchez's discrimination and retaliation claims, the allegations of Glaske's statements in paragraph 61 merely provide evidence of Glaske's requisite retaliatory and discriminatory animus. As the Supreme Court has explained, courts analyzing lawsuits alleging discriminatory actions are appropriately careful "not to treat such claims as arising from protected activity simply because the discriminatory animus might have been evidenced by one or more communications by a defendant." (*Park*, *supra*, 2 Cal.5th at p. 1065.)

In *Park*, the plaintiff filed discrimination and related claims after being denied tenure. (*Park*, *supra*, 2 Cal.5th at p. 1061.) His employer filed an

_____

[2] Defendants, on the other hand, failed to submit *any* evidence to the trial court in support of their argument that Sanchez's claims were based on protected activity. Glaske's declaration provided only very basic information about CoreCivic. It did not mention Sanchez or her claims.

anti-SLAPP motion, claiming its tenure decision and related communications were protected activity. (*Ibid*.) The Supreme Court rejected the employer's argument, holding that the elements of the plaintiff's discrimination claim "depend not on the grievance proceeding, any statements, or any specific evaluations of him in the tenure process, but only on the denial of tenure itself and whether the motive for that action was impermissible." (*Id*. at p. 1068.) The Court found that the alleged prejudicial comments of the dean merely supplied evidence of animus, not elements of the claim. (*Ibid*.) Likewise here—the allegations in paragraph 61 of Sanchez's complaint merely supply context and evidence of Glaske's animus.

*Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611 (*Martin*) is also instructive. The plaintiff in *Martin* sued his employer, a government agency, for discrimination and retaliation, resulting in his constructive discharge, as well as defamation. (*Id*. at pp. 624–625.) The employer filed an anti-SLAPP motion, contending that the discrimination and retaliation claims were based on negative evaluations of the plaintiff's performance at a board meeting, which constituted protected activity. (*Ibid*.) The Court of Appeal rejected the employer's argument. (*Ibid*.; see also *id*. at p. 625 ["Indeed, the board meeting is mentioned only minimally in plaintiff's pleadings. . . ."].) As the Supreme Court in *Park* noted, any liability for the defendants in *Martin* would "arise from the constructive discharge of the plaintiff for illegal reasons, not the defendants' evaluations of the plaintiff at the agency's board meeting." (*Park*, *supra*, 2 Cal.5th at p. 1066; see also *Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 594–595 [affirming order denying anti-SLAPP motion and finding that the communications that led to and followed the alleged injury-producing conduct were merely incidental to the asserted claims]; *San Ramon Valley Fire*

21

*Protection Dist. v. Contra Costa County Employees' Retirement Assn.* (2004) 125 Cal.App.4th 343, 354 [distinguishing for anti-SLAPP purposes between county retirement board's decision and the board's deliberations and vote that led to the decision, concluding that the latter were not protected].)

Again, the same is true here. Sanchez's complaint, declaration, and argument on appeal make clear that it is defendants' harassment and termination of Sanchez, not Glaske's statements at the meeting with the CDCR, that creates potential liability for defendants. We therefore conclude that Sanchez's first, second, fifth, sixth, and seventh causes of action are not based on protected activity.

2. *Sanchez's Harassment and Emotional Distress Claims*

Defendants also argue that Sanchez's fourth and eighth causes of action, for intentional infliction of emotional distress (IIED) and harassment based on her medical condition and election to take medical leave in violation of FEHA, are "indisputably entirely based on protected speech to the CDCR, namely Glaske's alleged communication of Respondent's poor job performance in an official CDCR meeting." They assert that this is the only fact in the complaint that could support a harassment claim against Glaske and CoreCivic and a claim for IIED against Glaske.

Contrary to defendants' assertion, Sanchez alleged many other facts in support of her harassment and IIED claims. We again conclude that the allegations in paragraph 61 merely provided context.

Section 12940, subdivision (j)(1), of FEHA makes it unlawful for an employer to harass an employee because of the employee's medical condition. (Gov. Code, § 12940, subd. (j)(1).) To establish a cause of action for harassment under FEHA, the employee must show that the harassing conduct was more than annoying or merely offensive—it must be severe or

22

pervasive. (*Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 940.) Similarly, a plaintiff asserting an IIED claim must prove that the defendant engaged in extreme and outrageous conduct that causes extreme or severe emotional distress. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050.)

The complaint explicitly states that Sanchez's claim for harassment against defendants is based on their failure to take corrective action to address discriminatory behavior and prevent harassment against her because of her medical condition and election to take medical leave, in violation of FEHA. In support of this claim, Sanchez alleges that she advised Glaske she had been having an extremely hard time dealing with her mother's recent passing, had missed numerous individual and group grief counseling sessions due to work, and was unable to take her prescribed medication—also due to work. According to Sanchez, Glaske knew all about Sanchez's health issues but still was not receptive to her request to take statutorily provided leave; instead, Glaske attempted to prevent her from taking leave, including by repeatedly insisting that Sanchez was not eligible for such leave despite having already confirmed her eligibility with CoreCivic's human resources department. Sanchez argues that these same facts also support her IIED claim.

Again, we find that the allegations in paragraph 61 merely provide context for Sanchez's harassment and IIED claims, as they demonstrate a "discriminatory animus" on Glaske's part.[3] (*Park*, *supra*, 2 Cal.5th at

_____

[3] Indeed, the allegations of paragraph 61 could not plausibly satisfy the element of extreme and outrageous conduct for an IIED claim. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050–1051 [IIED requires conduct so extreme as to exceed all bounds of that usually tolerated in a civilized society].) Although we do not decide the issue, the only allegations that *might* support such a claim are those involving Glaske's knowing retaliation against Sanchez for taking authorized medical leave to deal with her deep grief over

23

p. 1065.) Courts have consistently declined to treat claims of discrimination and retaliation as arising from protected activity simply because such discriminatory animus might have been evidenced by communications by a defendant. (*Ibid*.) And as Sanchez has confirmed, she does not seek relief based on anything Glaske did or did not say about her to the CDCR. There is no evidence showing otherwise—indeed, Sanchez did not even reference Glaske's comments to the CDCR in her declaration below.

We express no opinion as to whether the above facts sufficiently state a claim for harassment or IIED, or whether Sanchez is likely to prevail on these claims. The only question before us at this stage is whether any protected activity identified by defendants in paragraph 61 forms the basis for potential liability. We conclude that it does not.

3. *Sanchez's Unfair Business Practices Claim*

Finally, defendants argue that Sanchez's third cause of action, unfair business practices in violation of Business and Professions Code section 17200 et seq., or the unfair competition law (UCL), is based on protected speech and petitioning activity because the only statements described in the complaint as "false" or "fraudulent" are Glaske's statements to the CDCR and CoreCivic's severance offer. We again disagree.

First, defendants fail to explain how unknown statements from Glaske to the CDCR could form the basis of an unfair business practices claim. Second, we do not agree with defendants that *Bonni* stands for the proposition that a severance offer made during a termination meeting can be fairly categorized as part of "settlement negotiations" that constitute

---

her mother's death. (See *McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 295 [holding that retaliation "*does not necessarily* rise to the 'extreme and outrageous' standard required" for IIED (italics added)].)

24

protected petitioning activity. (See *Bonni*, *supra*, 11 Cal.5th at p. 1025.) On this basis alone, defendants have not met their burden of establishing that Sanchez's UCL claim arises from protected activity.

In any event, a UCL violation does not require false or fraudulent conduct. The UCL prohibits all types of unfair competition, including *unlawful*, *unfair*, and fraudulent business acts. (Bus. & Prof. Code, § 17200 et seq.) It "covers a wide range of conduct" and " 'borrows' violations from other laws by making them independently actionable as unfair competitive practices." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143.) Courts have also held that " '[a]n employer's business practices concerning its employee are within the scope of [the UCL].' " (*Davis v. Farmers Ins. Exchange* (2016) 245 Cal.App.4th 1302, 1326, fn. 17.) Sanchez alleges in her complaint that defendants violated several other laws, including FEHA, Labor Code sections 1102.5 and 1198.5, and Civil Code section 3344—none of which are based on protected activity. We therefore conclude that defendants have similarly failed to demonstrate that Sanchez's UCL claim is based on protected activity.

Because we determine that Sanchez does not seek relief based on any protected activity identified in paragraph 61 of the complaint, we need not reach the question of whether communications to and from the CDCR are in fact protected under section 425.16, subdivision (e), or whether Sanchez's claims have minimal merit. We note, however, that even if we were to strike paragraph 61, it would not result in any of Sanchez's claims being stricken, as she has sufficiently alleged and substantiated in her declaration other unprotected conduct supporting each cause of action.

## II

Sanchez asks us to award her attorneys' fees and costs on appeal, arguing that defendants' anti-SLAPP motion was frivolous and brought solely to cause unnecessary delay. Defendants contend that because their anti-SLAPP motion should have been granted, it is they who are entitled to an award of fees and costs. We agree with Sanchez that defendants' motion and this appeal were frivolous.

Section 425.16, subdivision (c)(1), provides that "[i]f the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion. . . ." In this context, frivolous "means that any reasonable attorney would agree the motion was totally devoid of merit." (*Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 450.) Appellate challenges to an anti-SLAPP motion are also subject to an award of fees and costs, in an amount to be determined by the trial court after the appeal is resolved. (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1320.)

Defendants contend that Sanchez "in her own words made protected conduct the cornerstone of her complaint." To the contrary—it is defendants who tried to do so, by repeatedly and unreasonably attempting to distort a single paragraph from Sanchez's 127-paragraph complaint and turn it into the basis of eight of her ten claims. Defendants also consistently misrepresented the actual content of Sanchez's complaint, both in the trial court and in this court. Further, they failed to submit any evidence in support of their argument that Sanchez's claims arose from protected activity, either when they filed their motion or in response to the detailed declaration Sanchez submitted in opposition. Without any supporting

26

evidence, defendants tried to manufacture a SLAPP theory by repeatedly asserting that they fired Sanchez at the request of the CDCR and claiming that the termination was therefore protected conduct in furtherance of the CDCR's speech—even going so far as to state that Sanchez "does not dispute that her termination came at the direction of the CDCR . . . ." But Sanchez clearly does dispute this claim. In fact, the only evidence in the record on this point is Sanchez's evidence suggesting that this was merely a pretext for her termination. Glaske easily could have stated in her declaration that the CDCR requested Sanchez's termination, but her declaration is conspicuously silent on the issue. And defendants submitted no other evidence to support their assertion that they fired Sanchez at CDCR's request.

"Both the Legislature and the Supreme Court have acknowledged the ironic unintended consequence that anti-SLAPP procedures, enacted to curb abusive litigation, are also prone to abuse." (*Olsen v. Harbison* (2005) 134 Cal.App.4th 278, 283.) By bringing a frivolous anti-SLAPP motion, then appealing its denial, a defendant forces the plaintiff to incur unnecessary fees and a long delay during the mandatory stay of proceedings pending appeal. (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 191 [appeal from denial of anti-SLAPP motion automatically stays trial court proceedings]; *Moriarty v. Laramar Management Corp.* (2014) 224 Cal.App.4th 125, 128 [noting that "appeal by a defendant whose anti-SLAPP motion failed below . . . will result in inordinate delay of the plaintiff's case and cause him to incur more unnecessary attorney fees"].) Courts must therefore be vigilant to protect against abuse of the statute. Specifically, courts must award fees when the defendant brings an objectively frivolous anti-SLAPP motion based on tangential or purely incidental allegations of arguably protected activity that are not the actual basis for the claims asserted. (See *Workman v.*

27

*Colichman* (2019) 33 Cal.App.5th 1039, 1056–1058 [award of reasonable attorneys' fees and costs for frivolous anti-SLAPP motion is mandatory].)

We believe no reasonable attorney could have concluded that this anti-SLAPP motion was well taken. This is particularly so after the trial court had already determined that defendants' motion was without merit and thus awarded Sanchez her fees below. After being put on notice by the trial court that their motion was frivolous, defendants proceeded with this appeal at their own peril. Accordingly, Sanchez may also recover reasonable fees for this appeal.

## DISPOSITION

The order denying the anti-SLAPP motion is affirmed. Sanchez shall recover her costs and fees on appeal. The matter is remanded to the trial court for a determination of the amount of recoverable costs and fees on appeal.

BUCHANAN, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.